BOGGS, Chief Judge,
dissenting.
Rwanda is a country with a tragic and tortured past, and an uncertain and unpleasant present. It is understandable that persons such as Mr. Niyibizi would want to get out and be in United States. The Nyizibizis did, and tried to stay here with a story that was found not credible, a decision that was affirmed at every level.
Nevertheless, he was not a bad person— he had skills—and the United States sought to use those skills in a laudable endeavor to prosecute those responsible for murders of Americans (while sparing Frenchmen) in Rwanda.
Quite probably, in my opinion, that service ought to merit him favorable consideration in one of the many ways that the United States government and Attorney General can provide it, in letting him stay, in recompense. However, that’s an “ought”—that’s not law. So, in this case we have to look at law.
In considering whether Niyibizi has demonstrated “changed country conditions,” we have to be clear as to who is on what side. The Rwandan government wanted to punish the alleged murderers; so did the United States; so did, apparently, Niyibizi—that’s the side he was helping.
Unfortunately for all on that side, the United States district court didn’t agree with their case—it made findings (over vociferous objections of the Department of Justice, the side Niyibizi was helping), that were deeply embarrassing to the Rwandan government. See United States v. Karake, 443 F.Supp.2d 8, 62-86 (reviewing the accounts of torture and abuse by the Rwandan government and concluding “the conditions under which defendants were held ... the abuse and mistreatment they endured while being interrogated shock the conscience”).
So, with that background, let’s examine the claim of changed country conditions.
At some points, it appears that the changed conditions cited by the majority is that “we” now know that the Rwandan government tortures some people (or at least that one United States court says so). There is no indication that these events, *378 lamentable as they may be, which occurred over a 15-month period from 2001 to 2003, are really “changed” from the time the Niyibizis’ first application was decided in 2004. Nor is there any indication that any general changes are relevant to him personally.
Indeed, the State Department Country report from 2000 (the one that would have been relevant at the time of the application) indicates that prison conditions were harsh and torture used. These are the same revelations as in Karake. Each country report between 2001 and 2004 also made similar claims, with reports of torture increasing and decreasing but there is a baseline of tough conditions, and “credible” allegations of torture against both prison officials and soldiers. If anything, there is steady improvement with less harsh language used toward the middle of the 2000s.
Even if this does constitute a change in country conditions, it is not explained why it is material to Niyibizi’s asylum application. For example, if Nazi Germany “changed” conditions by persecuting Buddhists as well as Jews, that would be a changed condition for Buddhists, but would not affect the ability of atheists to reopen an asylum application because their individual risk of persecution would remain unchanged. Niyibizi is not thought to be a murderer or in any way associated with the anti-government forces found tortured in Karake—in fact, he was helping to prosecute them.
At other points, and more plausibly, there is an intimation that the failure of the prosecution and the embarrassment of the Government of Rwanda by the holding of a federal judge would redound to the personal detriment of Niyibizi—a “when the team loses, you fire the coach” philosophy.
But that is the epitome of a personal change in condition.
I think precedent and legal structure compel us to find no abuse of discretion here—and urge the Attorney General to look at this case and use some part of his voluminous arsenal of discretion to permit Niyibizi to stay for his services to our country and system of justice.
The logic of the court’s charge that the BIA decided without “rational explanation” is weak. The BIA clearly says that there is no evidence of changed conditions—and it is right. By adding a word on credibility, which the court now finds fatal, it did no more than note that nothing in the new application added to the credibility of personal danger against Niyibizi.
Finally, with regard to the comment as to the “troubling” government action by the BIA’s decision, or the government lawyers’ defense of it, I would think it quite the opposite. It would be much more troubling if the Department of Justice’s relatively independent BIA, or the government lawyers charged with defending the BIA’s decision, could be pressured by Department of Justice prosecutors, because of Niyibizi’s assistance, to “fix” a BIA decision directly, or now “throw” this appeal. There is, to be sure, tension between the use of Niyibizi as a translator and the finding that he was not credible. But these are not mutually exclusive “realities”—people, especially people that are in extremely high stakes situations (staying or leaving the United States for a dangerous home country), sometimes lie or fabricate because of the stress of the situation or the horror of the alternative to their desired outcome. The IJ felt that was the case here. Those people are not always universally untrustworthy or bad people—and, indeed, Niyibizi proved to be neither, admirably helping our government and his government in the failed *379 prosecution in Karake—and this court does not need to pretend this is so. A denial of this petition for review would not put the imprimatur of our court on an alleged impropriety by the Justice Department, it would only insist that when asylum applications are reviewed, we emphasize the legal requirements of the Immigration and Naturalization Act. Again, it is my hope the Attorney General exercises his discretion in favor of Niyibizi, but that hope should not alter the stringent requirements for reopening a failed asylum application.